Bonnie Cruickshank **WALLACE,**[1] et al.

v.

**MERCANTILE COUNTY BANK, et al.**

Civil No. CCB–06–3345.

United States District Court,
D. Maryland.

Aug. 31, 2007.

---

1. Ms. Cruickshank Wallace has been referred to at times as "Ms. Cruickshank–Wallace," however, this opinion will use the former spelling to be consistent with the docket sheet.

See also 885 A.2d 403.

James C. Olson, Law Office of James C. Olson, Owings Mills, MD, Anthony P. Tabasso, Klehr Harrison Harvey Branzburg and Ellers LLP, philadelphia, PA, for Bonnie Cruickshank Wallace, et al.

Lawrence J. Gebhardt Ramsay M. Whitworth Gebhardt and Smith LLP Baltimore, MD for Mercantile County Bank, et al.

## *MEMORANDUM*

CATHERINE C. BLAKE, District Judge.

The plaintiffs in this case, Bonnie Cruickshank Wallace ("Ms. Cruickshank Wallace"), Holly Hall Publications, Inc. ("Holly Hall"),[2] and the Wallace Family 1997 Trust ("trust")[3] (collectively, "plaintiffs"), allege that the defendants, Mercantile County Bank, f/k/a County Banking and Trust Co. ("bank"), Raymond Hamm, Jr., president and CEO of the bank ("Mr. Hamm"), and Gebhardt & Smith, LLP ("law firm")[4] (collectively, "defendants"), committed various torts and violations of federal law in a prior suit and other actions they had taken against the plaintiffs. Four motions are currently pending: the plaintiffs' motion for remand to the Chester County Court of Common Pleas in Pennsylvania; the defendants' motion for dismissal or summary judgment; and two motions for sanctions brought by the defendants against Ms. Cruickshank Wallace and her counsel. The motions have been fully briefed, and oral argument was held on March 23, 2007. For reasons stated below, the plaintiffs' motion for remand will be denied; the defendants' motion for dismissal or summary judgment will be granted; and the motions for sanctions will be denied.

## BACKGROUND[5]

Conflict arose between the parties as a result of financial dealings between William Wallace ("Mr.Wallace"),[6] the husband of Ms. Cruickshank Wallace, and the bank. In 1995, the bank made two loans to Great Christian Books, Inc. ("Great Christian"), a mail-order retailer of Bibles and Christian books in Elkton, Cecil County, Maryland.[7] These loans included a revolving

---

**2.** It is not clear if Holly Hall is in fact operational at this time. In terms of its legal status, its charter had previously been revoked but was revived in October 2006. (*See* Pls.' Mem. Law Opp'n Defs.' Mot. Dismiss or Summ. J. [hereinafter "Pls.' Opp'n Dismiss or Summ. J."], Ex. F, State of Delaware Certificate for Renewal and Revival of Charter.) The court will accept for purposes of this case only that Holly Hall has the ability to bring suit.

**3.** Ms. Cruickshank Wallace is a trustee for the trust, and she brings this suit on the trust's behalf. There seem to have been more than one Wallace family trust over the years. Only one (the 1997 trust) is named as a plaintiff in this case, however, and it is not necessary for resolving the current motions to establish what others there may have been.

**4.** The law firm also represents all of the defendants. While the plaintiffs have hinted this might constitute a conflict of interest, they have not filed a motion to disqualify. (Pls.' Opp'n Dismiss or Summ. J. at 24 n. 5.)

**5.** The events giving rise to this suit have been detailed by the Court of Special Appeals in several opinions, thus only those necessary to decide the current motions will be set forth here. *See Great Christian Books, Inc. v. County Banking and Trust Co.,* No. 1813 (Md.Ct. Spec.App. Mar. 21, 2006), *cert. denied,* 393 Md. 245, 900 A.2d 751 (2006); *Cruickshank–Wallace v. County Banking & Trust Co.,* 165 Md.App. 300, 885 A.2d 403 (2005), *cert. denied,* 391 Md. 114, 892 A.2d 477 (2006); *Holly Hall Pubs., Inc. v. County Banking & Trust Co.,* 147 Md.App. 251, 807 A.2d 1201 (2002), *cert. denied,* 371 Md. 614, 810 A.2d 961 (2002).

**6.** Mr. Wallace is not a party to the current case.

**7.** These loans appear also to have been made to Hibbard & Hibbard ("H & H"), an affiliat-

credit loan for $750,000, and a capital improvement loan for a five-year term in the amount of $235,000. Mr. Wallace, a member of Great Christian's board of directors, was one of the guarantors of these two loans. According to the defendants, Mr. Wallace made fraudulent statements to the bank in order to obtain these loans. (Mem. Supp. Mot. Dismiss or Summ. J. [hereinafter "Mot. Dismiss or Summ. J."] at 3–4.) Great Christian seems not to have kept up with its loan payments, so in November 1998, the bank, through the law firm, entered a complaint in confession of judgment against Great Christian, Mr. Wallace, and other loan guarantors in the Circuit Court for Cecil County, Maryland (C98–362). The complaint was not contested, and in December 1998, non-judicial confessed judgments were filed by the bank against Great Christian and Mr. Wallace.[8]

The plaintiffs allege that the bank, under Mr. Hamm's leadership, engaged in commercially unreasonable conduct in disposing of some of Great Christian's collateral assets, thereby giving rise to potential claims by Mr. Wallace and Great Christian. (Compl. ¶¶ 15–16.) In May 1999, during a deposition taken in aid of executing the confessed judgments, Mr. Wallace informed Mr. Hamm and the law firm that Ms. Cruickshank Wallace had deposited the couple's 1998 joint federal income tax refund ("refund") in an account belonging only to her. (Mot. Dismiss or Summ. J., Ex. 8, Wallace Dep. 31:16–32:24.) The refund was in the amount of $19,984 (Compl. ¶ 18);[9] according to the plaintiffs, the defendants did not object to Bonnie keeping it, and she later used it for family support (id. at ¶¶ 18–19).

In February 2000, the bank filed a complaint in the Circuit Court for Cecil County against Ms. Cruickshank Wallace, Holly Hall, seemingly also a religious book retailer,[10] and the trust (naming a trustee other than Ms. Cruickshank Wallace)[11], alleging that they had received fraudulent conveyances from Great Christian and Mr. Wallace. The trust filed a timely answer to this complaint, as well as a counterclaim, but Ms. Cruickshank Wallace and Holly Hall did not respond, allegedly due to a

---

ed partnership that owned and leased to Great Christian the space it occupied. (Mem. Supp. Mot. Dismiss or Summ. J. [hereinafter "Mot. Dismiss or Summ. J."] at 3–4.) H & H is not a party to this case.

8. In November 1999, Mr. Wallace and Great Christian moved to re-open the confessed judgments based on allegations of wrongdoing by the bank. The Circuit Court for Cecil County denied this attempt. (See Mot. Dismiss or Summ. J., Ex. 7, Order.)

9. It appears as if a state income tax refund in the amount of $2,821 may also have been at issue, however, the exact amount of this refund or refunds does not affect the outcome of this case. See County Banking & Trust Co. v. Holly Hall Pubs., Inc., No. 07–C–00–000056 (Cir. Ct. Cecil County May 24, 2004) (located at Mot. Dismiss or Summ. J., Ex. 53.)

10. The defendants characterize Holly Hall as one of Great Christian's only two profitable divisions, spun off by Mr. Wallace in an effort to avoid collection efforts by the bank. (Mot. Dismiss or Summ. J. at 11.) Regardless of whether this is true, it is clear that Mr. Wallace was very closely involved with Holly Hall. (See "Pls.' Opp'n Dismiss or Summ. J.", Ex. F, State of Delaware Certificate for Renewal and Revival of Charter) (bearing Mr. Wallace's signature as Holly Hall's director.)

11. The defendants have not suggested that the naming of a trustee in the prior litigation who is not involved in the current suit impacts the ability of the trust to bring claims based on this past litigation. The defendants do argue more generally, however, that the trust is defunct and under "the sole control of the Wallaces, with no purpose or function other than to act as Plaintiff[] in this case". (Mot. Sanctions at 2.) They further contend that the trust was previously used to remove the only sources of profit from Great Christian before the bank collected on the loans. (Mot. Dismiss or Summ. J. at 7 n. 4.)

failure on the part of their attorney at the time, William Riddle ("Mr.Riddle"). A default judgment was thus entered against them in April 2000, whereas the trust was voluntarily dismissed from the case by the bank. Ms. Cruickshank Wallace and Holly Hall made unsuccessful motions to vacate the default judgment, and the bank then moved for an entry of final judgment against them, which was entered on September 10, 2001. A judgment in the amount of the refund was entered against Ms. Cruickshank Wallace. An order in the amount of $722,534 against Ms. Cruickshank Wallace and Holly Hall, jointly and severally, was entered as well, which the plaintiffs allege was entered improperly. (Compl.¶ 32.) The basis for the contention this second order was improper seems to be that the court did not mention it in its ruling from the bench; rather, an attorney for the law firm, Eric Schuster ("Mr.Schuster"), listed the $722,534 on the "form of order" he submitted.[12] (*Id.*) Ms. Cruickshank Wallace and Holly Hall filed a timely appeal of this ruling, after their motion for a new trial and motion to alter or amend the judgment were denied.

The defendants then obtained Maryland writs of garnishment ("first writs") against Ms. Cruickshank Wallace for $742,518 (the total amount of the two judgments entered on September 10, 2001). The plaintiffs allege this action was improper because the defendants knew an appeal was pending and the judgments were not final.[13] (*Id.* at ¶ 36.) The defendants claim they were at liberty to collect on the September 2001 judgments, despite their lack of finality, because Ms. Cruickshank Wallace and Holly Hall had not posted the proper appeal bond. (Mot. Dismiss or Summ. J. at 8.) They further contend that Ms. Cruickshank Wallace did not object to the collection. (*Id.*) More than $40,000 of funds belonging to Ms. Cruickshank Wallace allegedly were attached pursuant to these first writs. (Compl.¶ 38.)

One of the garnishees was Peoples Bank ("Peoples") of Oxford, Chester County, Pennsylvania. Peoples answered that the Circuit Court for Cecil County had no jurisdiction over it due to its Pennsylvania residency. (*Id.* at ¶¶ 39–41.) The defendants do not dispute they obtained the writs or that Peoples was one of the garnishees, but contend they believed Peoples to be subject to the jurisdiction of the Maryland courts. (Mot. Dismiss or Summ. J. at 9.) In October 2001, the defendants entered judgment by transfer against Ms. Cruickshank Wallace and Holly Hall in the Court of Common Pleas of Chester County, Pennsylvania ("first transfer"). The plaintiffs characterize this transfer as the result of Peoples's jurisdictional challenge (Compl. at ¶ 42), while the defendants claim it was the consequence of the Wallaces having moved from Maryland to

---

**12.** Regardless of the manner in which the Circuit Court for Cecil County set forth these judgments, the docket entry for the proceeding is as follows: "Entry Of Judgment against Bonnie Wallace in the amount of $19,984.00 in favor of County Bank. Entry Of Judgment against Holly Hall and Bonnie Wallace, jointly and severally in the amount of $722,534.00 in favor of County Bank. Order For Entry of Judgment Submitted Signed, Order To Be Submitted by Eric Schuster, Esq. regarding the motions that were denied at the hearing." (Compl.¶ 31.) Both judgments were thus signed and recorded by the court.

**13.** These judgments were later determined not to be final because they omitted several declaratory judgment counts. It is not clear if the plaintiffs' position is that the defendants were aware of this defect when the writs issued, or that the defendants were simply aware of the pending appeal. As the defendants observe, however, both sides seem to have believed the judgments to be final, as reflected in the issuance of the writs and the filing of the appeal. (Mot. Sanctions at 7.)

Pennsylvania in December 2000. (Mot. Dismiss or Summ. J. at 8.)

Following the first transfer and continuing over the course of the rest of the events giving rise to this case, the plaintiffs allege the defendants or others associated with them threatened or intimidated Ms. Cruickshank Wallace, resulting in severe emotional distress to her. These threats included selling her home; subpoenaing her mother, who has Alzheimer's disease (ostensibly because she and Ms. Cruickshank Wallace had some joint bank accounts); and threatening to sue her children. (*See* Compl. at ¶¶ 43, 44, 46, 47, 54, 59–63.) Mr. Schuster is the attorney for the law firm who the plaintiffs allege committed most of this misconduct, including making Ms. Cruickshank Wallace concerned for her physical safety. (*Id.* at ¶ 59.) These threats also allegedly compelled her to seek bankruptcy protection in the United States Bankruptcy Court for the Eastern District of Pennsylvania. (*Id.* at ¶ 45.)

In the spring of 2002, the Court of Special Appeals of Maryland remanded the September 2001 judgments to the Circuit Court for Cecil County because they had omitted two declaratory judgment counts involving Holly Hall and therefore did not constitute final judgment under state law. The Circuit Court then entered final judgment on all counts for $742,518 against Ms. Cruickshank Wallace and $722,805 against Holly Hall. Ms. Cruickshank Wallace and Holly Hall again filed a timely appeal, but the defendants allege they again failed to post the appropriate bond "to stay enforcement of the judgment during the appeal." (Mot. Dismiss or Summ. J. at 7.) In May 2002, the defendants again obtained Maryland writs of garnishment ("second writs") against Ms. Cruickshank Wallace, and again served Peoples despite not having transferred the new judgment to Pennsylvania. In June 2002, the defendants transferred the April 2002 judgments to the Court of Common Pleas of Chester County, Pennsylvania ("second transfer"), resulting in that court's docket reflecting two separate judgments against Ms. Cruickshank Wallace, each for $742,518, and two separate judgments against Holly Hall, each for $722,805.

Shortly afterwards, the defendants had a writ of execution issued to the Chester County Sheriff, which was served upon Ms. Cruickshank Wallace's counsel, Edward M. Foley ("Mr. Foley"). (Compl. ¶ 53.) The plaintiffs allege that, at the same time, the defendants served Mr. Foley with interrogatories and a request for Ms. Cruickshank Wallace's documents, which Mr. Foley responded to by claiming attorney-client confidentiality. (*Id.*) The plaintiffs also allege that the defendants contacted Mr. Riddle's malpractice carrier, CNA Insurance Co. ("CNA"), and tried to collect a claim on the plaintiffs' behalf. (*Id.* at ¶¶ 56–57.) When the plaintiffs learned of this, they negotiated a settlement directly with the insurance carrier. (*Id.* at ¶ 58.) The defendants allege that once they learned of a possible malpractice settlement, they directed a garnishment from the Chester County Court to Mr. Foley's firm, which they believed was holding the proceeds of the settlement. (Mot. Dismiss or Summ. J. at 9.) They do not dispute the plaintiffs' contention that a sheriff served this writ, and they further admit that they did, as the plaintiffs claim, serve interrogatories on the firm which went unanswered on attorney-client privilege grounds.

In September 2002, the Court of Special Appeals vacated the original default judgment on the ground that the Circuit Court's failure to do so was punitive and an abuse of discretion. *See Holly Hall Pubs., Inc. v. County Banking & Trust Co.*, 147 Md.App. 251, 807 A.2d 1201, 1210–

11 (2002). The defendants continued to pursue evidence of fraudulent conveyances and suggested they were prepared to use private investigators to track down the funds they believed existed. (Compl.¶¶ 65–66.) The plaintiffs claim that they, Mr. Wallace, and Great Christian responded by voluntarily waiving all protective privileges with their accountants to facilitate discovery and avoid secretive searches. (Id. at ¶ 67.) The defendants in turn state they then stopped collection efforts (none of which had been successful in recovering funds), dismissed their garnishments, and sought to vacate the two rounds of judgments transferred to the Chester County Court. (Mot. Dismiss or Summ. J. at 10.) Extensive discovery across three states and the District of Columbia then took place into 2004. It included depositions of Ms. Cruickshank Wallace, Mr. Wallace, and accountants, attorneys, and officers of Holly Hall and Great Christian. It also included production of financial records from Ms. Cruickshank Wallace, Mr. Wallace, and Ms. Cruickshank Wallace's mother.[14] The plaintiffs contend that discovery did not support the bank's claims (Compl.¶ 79), while the defendants argue that discovery did reveal fraudulent conveyances in addition to the refund (Mot. Dismiss or Summ. J. at 11).

At the conclusion of discovery, Ms. Cruickshank Wallace and Holly Hall filed a motion for summary judgment, and the bank filed a motion for partial summary judgment on the issue of the refund only. In May 2004, following a hearing on the cross motions for summary judgment, the Circuit Court for Cecil County granted summary judgment in favor of Ms. Cruickshank Wallace on some counts of alleged fraudulent conveyances and transfers, but granted summary judgment in favor of the bank on the issue of the refund. See County Banking & Trust Co. v. Holly Hall Pubs., Inc., No. 07–C–00–000056 (Cir. Ct. Cecil County May 24, 2004) (located at Mot. Dismiss or Summ. J., Ex. 53.) The court did not rule on the claims against Holly Hall, as the defendants had abandoned those (allegedly because the company was defunct). (Mot. Dismiss or Summ. J. at 13.)

In July 2004, the bank filed a motion to dismiss the balance of the case without prejudice. In its supporting memorandum, the bank stated that it had offered, on several occasions, to dismiss the lawsuit against Ms. Cruickshank Wallace and release its judgment against Mr. Wallace in exchange for releases signed by them because it feared the possibility that they and Great Christian would bring "crank litigation", such as the case that remained pending before the Circuit Court in which Great Christian and some Wallace Trusts were suing the bank.[15] Thus in order to retain its ability to assert counter-claims in potential future lawsuits, the bank wanted the suit voluntarily dismissed rather than dismissed with prejudice. (See Compl., Ex. A.)

The plaintiffs characterize this explanation as evidence that the suit against Ms. Cruickshank Wallace and Holly Hall had been pursued not in an effort to find and collect alleged fraudulent conveyances, but rather to coerce the plaintiffs into signing releases so the bank would not have to

---

14. The plaintiffs claim that the defendants again sought to obtain privileged communications from attorney Foley. (Compl.¶ 78.)

15. This lender liability suit brought by Mr. Wallace and Great Christian was filed in 2002 in Harford County, Maryland, which transferred it to Cecil County. The Circuit Court for Cecil County granted summary judgment for the bank, which was affirmed by the Court of Special Appeals, and certiorari was denied by the Court of Appeals. (Mot. Dismiss or Summ. J. at 15; see also Exs. 59–63.)

face legitimate suits by Mr. Wallace and Great Christian. (Compl. ¶ 86.) They also claim this motivation explains the early dismissal of the trust from the lawsuit the bank brought, because the defendants did not want the trust to be able to conduct discovery and give the plaintiffs grounds to bring a suit against the defendants. (*Id.* at ¶ 87.) The defendants claim they dismissed the trust upon realizing it was an empty shell, so that they could make any judgments again Ms. Cruickshank Wallace and Holly Hall final and enforceable. (Mot. Dismiss or Summ. J. at 7.) They also claim their offers to abandon their claims in exchange for releases stemmed from their desire to avoid expensive and fruitless litigation as opposed to any concern about legitimate claims being brought by Mr. Wallace or Ms. Cruickshank Wallace. (*Id.* at 14–15.) The Circuit Court for Cecil County granted the bank's motion to dismiss the balance of the claims voluntarily. (*See* Mot. Dismiss or Summ. J., Ex. 54, Order.)

Ms. Cruickshank Wallace appealed the judgment against her for the refund to the Court of Special Appeals, which affirmed the Circuit Court's decision, and the Court of Appeals declined to review the case. *See Cruickshank–Wallace v. County Banking & Trust Co.,* 165 Md.App. 300, 885 A.2d 403 (2005), *cert. denied,* 391 Md. 114, 892 A.2d 477 (2006). In April 2006, the bank transferred its judgment for the amount of the refund only to the Chester County Court. The plaintiffs allege that since the default judgments against them were vacated, the defendants have refused their requests to contact the credit reporting agencies and have the judgments improperly entered in the Chester County Court and the garnishment actions improperly pursued removed from the plaintiff's credit reports. (Compl. ¶ 88.) Ms. Cruickshank Wallace alleges that the continued existence of this information on her credit reports has caused her damages, including severe emotional distress. (*Id.* at ¶ 89.)

The plaintiffs filed the complaint in the current case on or about June 24, 2006, in the Court of Common Pleas of Chester County, Pennsylvania. The complaint contains the following counts brought on behalf of all the plaintiffs: abuse of process by the bank and Mr. Hamm (count I); abuse of process by the law firm (count II); wrongful use of civil proceedings by the bank and Mr. Hamm (count III, pled in the alternative to count I); wrongful use of civil proceedings by the law firm (count IV, pled in the alternative to count II); and civil conspiracy among all the defendants (count VII). Ms. Cruickshank Wallace also asserts the following claims on her own behalf: defamation of creditworthiness by all the defendants (count V); deprivation of due process by all the defendants (count VI); and a conspiracy among all the defendants to interfere with her civil rights (count VIII). The due process and interference claims are asserted under 42 U.S.C. §§ 1983 and 1985, respectively.

The defendants filed a notice of removal based on federal question jurisdiction and diversity jurisdiction. They allege that Ms. Cruickshank Wallace is a citizen of Pennsylvania; Holly Hall is a Delaware corporation with its principal place of business in Pennsylvania; the trust is organized under Delaware law with its trustee (Ms. Cruickshank Wallace) residing in Pennsylvania; and all the defendants are citizens of Maryland. They further allege that the actual amount in controversy is in excess of $75,000, although the complaint only alleges an amount in excess of $50,000, which seems to be the threshold under Pennsylvania's pleading requirements.

After the suit had been removed to the United States District Court for the Eastern District of Pennsylvania, the defen-

dants moved to dismiss it or transfer it to Maryland. The district court ordered the transfer on November 9, 2006, pursuant to 28 U.S.C. § 1404(a), which provides for transfer to a district where the case could have been brought when the convenience of parties and witnesses and the interest of justice weigh in favor of the transfer. The court concluded that "[t]he state of Maryland has a far greater interest in the outcome of this case than does the commonwealth of Pennsylvania." *Wallace v. Mercantile County Bank,* 2006 WL 3302490 *4 (E.D.Pa.2006) (unpublished). In reaching this conclusion, the court considered the fact that only the credit defamation claim specifically alleges activity in Pennsylvania, but that even this count has its foundation in the Maryland litigation brought by the bank against the plaintiffs. (*Id.*) While a plaintiff's choice of forum usually gets substantial weight, it receives less in this determination because the operative facts underlying the litigation occurred outside of the chosen forum. (*Id.* at **4–5.)

Concurrently with their motion for transfer or dismissal, the defendants filed a motion for dismissal or summary judgment, which the plaintiffs opposed. Following transfer to this court, the defendants re-filed the motion to dismiss or for summary judgment on December 15, 2006, and the plaintiffs opposed the motion on the same day. Based on the plaintiffs' opposition to the motion for dismissal or summary judgment (in both the Eastern District of Pennsylvania and the District of Maryland), the defendants sent the plaintiffs a letter on November 13, 2006, informing the plaintiffs they would request Rule 11 sanctions after 21 days if the complaint and the opposition to the motion to dismiss or for summary judgment were not withdrawn. The plaintiffs allege that during the 21–day "safe harbor" period which followed, Fed.R.Civ.P. 11(c)(1)(A), they moved to voluntarily dismiss counts VI–VIII under Fed.R.Civ.P. 41(a)(1)(i). The defendants contend that the plaintiffs are unable to dismiss just part of an action under this rule and continue to press their request for sanctions, which was filed with this court on December 18, 2006.

On February 9, 2007, the plaintiffs filed a motion asking the court to remand the case to state court. The defendants oppose this request, arguing that even if the federal question claims somehow drop out, diversity jurisdiction remains. On March 22, 2007, the defendants filed a second motion for Rule 11 sanctions based on the plaintiffs' remand request. A hearing was held on these four motions—motion for dismissal or summary judgment, motion to remand, and two Rule 11 requests—on March 23, 2007.

## ANALYSIS

### Motion to Remand

■ The plaintiffs ask the court to remand their suit to the Chester County Court for Common Pleas in Pennsylvania, where it was originally filed, pursuant to 28 U.S.C. § 1447(c). They argue that they have voluntarily dismissed the two counts giving rise to federal question jurisdiction (42 U.S.C. §§ 1983 & 1985), and thus no basis for federal jurisdiction remains. They acknowledge this court's "discretion to retain *or* dismiss state law claims" after "the federal basis for an action drops away," *Shanaghan v. Cahill,* 58 F.3d 106, 109 (4th Cir.1995) (citing 28 U.S.C. § 1367), but argue the best course of action would be not to retain the state law claims. The defendants' primary ground of opposition is that diversity jurisdiction exists, thus the case must stay in this court. The plaintiffs respond that the amount in controversy requirement is not met, so diversity jurisdiction does not exist.

■ As will be further discussed below, the § 1983 and § 1985 claims will be

dismissed by order of the court (as opposed to voluntarily by the plaintiffs), and thus no basis for federal question jurisdiction remains. It is not necessary for the court to resolve the dispute over the existence of diversity jurisdiction because the court will exercise its discretion to retain the state law claims. "Recent case law has emphasized that trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan,* 58 F.3d at 110 (internal citations omitted). Factors informing the exercise of this discretion may include "comity ... and considerations of judicial economy," in the service of applying this " 'doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values.' " *Id.* (internal citations omitted).

When ruling on the defendants' earlier motion for dismissal or transfer, the United States District Court for the Eastern District of Pennsylvania found that "two factors weigh heavily in defendants' favor and warrant transferring the case to the District of Maryland [under 28 USC § 1404(a)]:(1) plaintiffs' claims arose in Maryland; and (2) the District of Maryland has an interest 'in deciding local controversies at home.' " *Wallace,* 2006 WL 3302490 at *4 (internal citations omitted). The plaintiffs are now asking for the case to be sent back to Pennsylvania state court, despite the unequivocal conclusion by the United States District Court for the Eastern District of Pennsylvania that "[t]he state of Maryland has a far greater interest in the outcome of this case than does the commonwealth of Pennsylvania." (*Id.*) The plaintiffs have not presented any reason to disrespect the principle of judicial comity and send the case back to Pennsylvania. Furthermore, it would be an unnecessary expenditure of judicial resources for the case to be moved to another court when dispositive motions already have been briefed and argued. For these reasons, this court will exercise its discretion to retain jurisdiction over the state law claims.

## Motion to Dismiss or for Summary Judgment

### Motion to Dismiss Standard

■ "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, a Rule 12(b)(6) motion does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir.1999) (internal quotation marks and alterations omitted). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States,* 120 F.3d 472, 474 (4th Cir.1997). To survive a motion to dismiss, however, a complaint must "in light of the nature of the action ... sufficiently allege each element of the cause of action so as to inform the opposing party of the claim and its general basis." *Chao v. Rivendell Woods, Inc.,* 415 F.3d 342, 348 (4th Cir.2005). In addition, because the court is testing the legal sufficiency of the claims, the court is not bound by the plaintiff's legal conclusions. *See, e.g., Young v. City of Mount Ranier,* 238 F.3d 567, 577 (4th Cir.2001) (noting that the "presence ... of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6)" when the facts alleged do not support the legal conclusions).

### Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir.2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)). The court must "view the evidence in the light most favorable to ... the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir.2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at

526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir.1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

*Civil Rights and Conspiracy Claims*

■ The plaintiffs attempted to voluntarily dismiss their § 1983, § 1985, and conspiracy claims (counts VI, VII, and VIII) pursuant to Fed.R.Civ.P. 41(a)(1)(i) by filing a notice of voluntary dismissal on December 5, 2006 (in the Eastern District of Pennsylvania) and on December 15, 2006 (in this court). As the plaintiffs conceded during the March 23, 2007 motions hearing, Rule 41(a) is not the proper vehicle for dismissing individual claims within a suit. Rule 41(a) allows for dismissal of entire *actions* without prejudice prior to the first of service of an answer or a motion for summary judgment by the other party.[16] Fed.R.Civ.P. 41(a)(1)(i); *see Hells Canyon Pres. Council v. United States Forest Serv.*, 403 F.3d 683, 687–89 (9th Cir.2005) (stating that Rule 41(a)(1) "does not allow for piecemeal dismissals ... withdrawals of individual claims against a given defendant are governed by Fed.R.Civ.P. 15") (internal citations omitted); *see also Iraheta v. United of Omaha Life Ins. Co.*, 353 F.Supp.2d 592, 595–96 (D.Md.2005) (explaining that "the Fourth Circuit has indicated that Fed.R.Civ.P. 15 is the technically proper rule under which to consider a plaintiff's request to drop some, but not all, of the claims asserted in an action") (internal citations omitted). The plaintiffs have not filed a Rule 15 motion to amend their complaint, thus the court will construe their December notice and their assertion during oral argument

**16.** The defendants first filed a motion to dismiss or for summary judgment in the Eastern District of Pennsylvania on October 6, 2006, but the plaintiffs did not attempt to dismiss under Rule 41(a) until December 5, 2006. As the defendants had already filed a motion for summary judgment at that time, however, the plaintiffs could not avail themselves of Rule 41(a), even if they had properly sought to dismiss the entire action rather than certain claims.

that the case should be viewed as no longer containing counts VI, VII, and VIII to mean they are not opposing the defendants' motion to dismiss with respect to these counts. Accordingly, the § 1983, § 1985, and conspiracy claims will be dismissed.

*Choice of Law Analysis*

■ Both sides submit that the court must decide whether to apply Maryland or Pennsylvania law, with the plaintiffs advocating for Pennsylvania law, and the defendants for Maryland law. The parties agree, however, that Pennsylvania's choice of law principles apply. *See Ferens v. John Deere Co.*, 494 U.S. 516, 523, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990), *superseded by statute on other grounds* (explaining that, under 28 U.S.C. § 1404(a), a transferee court must apply the law the transferor court would have applied in a case before it on diversity grounds); *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (holding that a federal district court must apply the conflict of laws principles of the state in which it sits to a diversity case) (citing, *inter alia, Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

■ The first step in a choice of law analysis under Pennsylvania law is an " 'interest analysis' of the policies of all interested states and then—based on the result of that analysis—characteriz[ing] the case as a true conflict, false conflict, or unprovided-for case." *Budget Rent–A–Car Sys., Inc. v. Chappell*, 407 F.3d 166, 170 (3d Cir.2005) (internal citations omitted). If the " 'governmental interests of [multiple] jurisdictions would be impaired if their law were not applied,' " then a true conflict exists. *Id.* (internal citations omitted). If, however, " 'only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law,' " then it is a false conflict. *Id.* (internal citations omitted). In the event that "no jurisdiction's interests would be impaired if its laws were not applied," an unprovided-for case results. *Id.* (internal citations omitted).

■ Turning first to the claim for malicious use of process [17], as the parties agree, the interested states are Maryland and Pennsylvania. The underlying litigation on which the plaintiffs' current suit is based was filed in Maryland and worked its way through the Maryland state court system. At the time the suit was filed, Ms. Cruickshank Wallace was a Maryland citizen, as were the defendants, and Holly Hall's principal place of business was at a Maryland address.[18] (Mot.Summ. J., Ex. 10, Compl.) Maryland regards suits for malicious use of process with disfavor because "[p]ublic policy requires that citizens be free to resort to the courts to resolve grievances without fear that their opponent will retaliate with a malicious use of process lawsuit against them." *One Thousand Fleet Ltd. v. Guerriero*, 346 Md. 29, 694 A.2d 952, 955–56 (1997) (internal citations omitted). This disfavor is evident in the requirement that "five elements ... all must coexist to maintain [this] action." *Id.* at 956 (internal citations omitted). The element that sets a particularly high bar for maintenance of the action is the establishment of damages by the plaintiff by

---

**17.** A suit for malicious use of process may also be referred to as a suit for malicious prosecution. It is also known as a claim for wrongful use of civil proceedings under Pennsylvania statutory law. When referring generally to this cause of action, the court will speak of malicious use of process.

**18.** The trustee named on behalf of the trust in the original suit was a Delaware resident, and Holly Hall was incorporated in Delaware, however, neither party is arguing for the application of Delaware law.

"arrest or imprisonment, by seizure of property, or other special injury which would not necessarily result in all suits prosecuted to recover for a like cause of action." *Id.* (internal citations omitted). Maryland thus has an interest in its citizens' unfettered access to the judicial system to resolve their disputes, *id.* at 955–56, as well as interests in "protecting the expectations of … litigants and counsel regarding the circumstances under which they will be held accountable for malicious prosecution, and in 'regulating the use of its process and in determining when its judicial system is maliciously used.'" *Rosen v. Tesoro Petroleum Corp.*, 399 Pa.Super. 226, 582 A.2d 27, 31 (1990) (internal citations omitted) (discussing the interests of another state when conducting a choice of law analysis between Pennsylvania and the other state for malicious use of process when the underlying suit was brought against Pennsylvania citizens in the other state's court by members of the other state's bar).

In contrast, Pennsylvania has an interest in providing redress for its citizens who have suffered from the wrongful initiation or continuation of civil proceedings. *See Rosen*, 582 A.2d at 31 (stating that Pennsylvania has an "interest in discouraging maliciously brought suits which require its citizens to spend time and money defending themselves") (internal citations omitted). This interest may be seen in Pennsylvania's codification of the common law action for malicious use of process in the Dragonetti Act, 42 Pa.C.S.A. § 8351 (under the name "wrongful use of civil proceedings"),[19] which makes it easier for a plaintiff to recover, most significantly because the requirement of arrest or seizure

has been omitted. *See id.* at 30. Although Ms. Cruickshank Wallace was not a Pennsylvania citizen at the time the underlying suit was filed, she did move to Pennsylvania while the suit was still active, (Pls.' Opp'n Mot. Dismiss or Summ. J., Ex. C, Aff. Bonnie Wallace ¶ 4), and Holly Hall's address seems to have changed with the Wallaces' (Pls.' Mot. Dismiss or Summ. J., Ex. E, Aff. Eric Schuster ¶ 3). In addition, the Pennsylvania legal system had some degree of involvement in the suit due to the transfer of the Maryland judgments to its courts and the garnishment attempts using Pennsylvania process. Given that the Dragonetti Act specifically provides for liability for wrongful use of civil proceedings for the continuation of an improperly brought suit, 42 Pa.C.S.A. § 8351(a), Pennsylvania's interests are implicated in this case.

A true conflict thus exists, because the interests of both Maryland and Pennsylvania would be impaired if the other jurisdiction's law were to apply. *See Budget Rent–A–Car Sys., Inc.*, 407 F.3d at 170. The policies underlying each state's law are different, with Maryland seeking to promote litigants' access to the courts, *see One Thousand Fleet Ltd.*, 694 A.2d at 955–56, while Pennsylvania seeks to protect its citizens from the need to defend against improper suits, *see Rosen*, 582 A.2d at 31. *See also id.* at 30–31 (finding a true conflict between the malicious use of process laws of Texas and Pennsylvania based on Texas's policy "to assure every potential litigant free and open access to the judicial system without fear of a countersuit for malicious prosecution" and Pennsylvania's provision of "greater protection to those

---

**19.** The statute provides liability for a person who "takes part in the procurement, initiation or continuation of civil proceedings against another" if "(1) He acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and (2) The proceedings have terminated in favor of the person against whom they are brought." 42 Pa.C.S.A. § 8351(a).

individuals who may be forced to defend a baseless suit") (internal citations omitted).

■ Because there is a true conflict, "the law of the state having the most significant contacts or relationships with the particular issue" must be applied. *Budget Rent–A–Car Sys., Inc.*, 407 F.3d at 170 (internal citations omitted). Among the factors that may influence this determination are the relevant policies of the interested states, discussed above, as well as "the relative interests of those states in the determination of the particular issue, [and] ... the protection of justified expectations." *Id.* (internal references omitted). In this case, Maryland has the most significant contacts and relationship with the events giving rise to the malicious use of process claim. The underlying suit was instituted in its courts and involved its citizens, thereby giving rise to the justified expectation that Maryland law would govern potential liability for malicious use of process. To the extent Pennsylvania courts or process were involved, it was only as a means of enforcing the judgments of Maryland courts. The underlying suit was not filed in Pennsylvania. Given that Ms. Cruickshank Wallace and, by extension, Holly Hall only moved to Pennsylvania during the pendency of the action, there would have been no expectation by the parties when the suit commenced that Pennsylvania law might govern potential liability for malicious use of process. For these reasons, Maryland law must be applied to the malicious use of process claim. *See Rosen*, 582 A.2d at 31–32 (applying Texas law rather than Pennsylvania law based on similar considerations).

It is not necessary to conduct a choice of law analysis for the abuse of process or defamation claims, as the outcome is the same under either Maryland or Pennsylvania law.

*Malicious Use of Process*

■ The plaintiffs refer to counts III and IV as being for "wrongful use of civil proceedings," which is the name Pennsylvania statutory law has given to the "common law action of malicious use of process". *McGee v. Feege*, 517 Pa. 247, 535 A.2d 1020, 1024 n. 8 (1987) (citing 42 Pa. C.S.A. § 8351 for the statutory cause of action). Because Maryland law applies to these counts, they are properly understood as being for malicious use of (civil) process. Under Maryland law, malicious use of process is a disfavored cause of action with five elements that "all must co-exist to maintain the action." *One Thousand Fleet Ltd.*, 694 A.2d at 955–56 (internal references omitted). These elements are as follows:

> First, a prior civil proceeding must have been instituted by the defendant.[20] Second, the proceeding must have been instituted without probable cause ... Third, the prior civil proceeding must have been instituted by the defendant with malice ... Fourth, the proceedings must have terminated in favor of the plaintiff[21] ... Finally, the plaintiff must establish that damages were inflicted upon the plaintiff by arrest or imprisonment, by seizure of property, or other special injury which would not necessarily result in all suits prosecuted.

*Id.* at 956 (internal references omitted). Probable cause is defined as " 'a reasonable ground for belief in the existence of

---

**20.** Note that the only named plaintiff in the underlying suit was the bank.

**21.** There is disagreement between the parties in whose favor the initial proceedings termi-

nated. Because this claim is disposed of on other grounds, however, this issue does not require resolution.

such state of facts as would warrant institution of the suit or proceeding complained of.' " *Id.* (internal references omitted).

The defendants here initiated the suit after having learned from Mr. Wallace's deposition testimony that Ms. Cruickshank Wallace had deposited their joint income tax refund into an account belonging only to her. Mr. Wallace further admitted that the income on which this refund was based was earned primarily if not exclusively by him (Mot. Dismiss or Summ. J., Ex. 8, Wallace Dep. 31:16–32:24), thus it was not unreasonable for the defendants to believe that Mr. Wallace may have attempted to transfer other funds belonging to him or under his control to other people or entities to avoid the bank's collection efforts. It was also not unreasonable for the defendants to conclude that Mr. Wallace's wife and a family trust could be the recipients of such fraudulent transfers, especially in light of the acknowledged refund transfer. Given Mr. Wallace's membership on the Great Christian board, and that the judgment the bank had (and was having difficulty collecting) was against both Mr. Wallace and Great Christian, after learning of Mr. Wallace's action with the refund, it was not unreasonable for the defendants to believe that Great Christian's assets might also have been moved to avoid detection.[22] Holly Hall, of which Mr. Wallace identified himself as the director and which seemed to have long shared at least an address, if not more, with the Wallaces, would have been a logical candidate for receipt of such transfers.[23] Accordingly, because the defendants did not institute their previous suit against the plaintiffs without probable cause, the plaintiffs cannot maintain a cause of action for malicious use of process, and summary judgment on this claim will be granted to the defendants.

*Abuse of Process*

This is a common law cause of action under the laws of both Maryland and Pennsylvania that provides redress for a plaintiff who has been the victim of process used for a purpose outside of those for which the law provides. *See One Thousand Fleet Ltd.*, 694 A.2d at 956 (explaining that "abuse of process is concerned with the improper use of criminal or civil process in a manner not contemplated by law after it has been issued") (internal citations omitted); *McGee*, 535 A.2d at 1023 (explaining that "[t]he gist of an action for abuse of process is the improper use of process after it has been issued, that is, a perversion of it") (internal citations omitted). Under Pennsylvania law, three elements are required for an abuse of process action to lie: "(1) an 'abuse' or 'perversion' of process already initiated; (2) with some unlawful or ulterior purpose, and (3) harm to the plaintiff as a result." *Kedra v. Nazareth Hosp.*, 868 F.Supp. 733, 738 (E.D.Pa.1994) (internal citations omitted). *See also McGee*, 535 A.2d at 1026 (holding that "seizure or deprivation of property is not an indispensable [sic] element of the tort of abuse of process"). Maryland law also requires three elements: "first, that the defendant wilfully used process after it has issued in a manner not contemplated by law ... second, that the defendant acted to satisfy

**22.** According to the prior complaint the defendants brought against the plaintiffs, at one point Great Christian divested most of its assets to Holly Hall. (Mot. Dismiss or Summ. J., Ex. 10, Compl. ¶ 6.) This allegedly took place prior to Great Christian's default on the bank's loan.

**23.** According to the prior complaint the defendants brought against the plaintiffs, the trust holds 75% of the capital stock in Holly Hall. (Mot. Dismiss or Summ. J., Ex. 10, Compl. ¶ 7.) This also allegedly occurred prior to Great Christian's default on the bank's loan.

an ulterior motive; and third, that damages resulted from the defendant's perverted use of process." *One Thousand Fleet Ltd.*, 694 A.2d at 956 (internal citations omitted).

 The laws of both jurisdictions provide that a defendant will not be liable if his actions consist solely of seeing the lawsuit through to its "authorized conclusion", even if he or she did so with bad motives. *See id.* (explaining that " '[n]o liability is incurred where the defendant has done nothing more than pursue the lawsuit to its authorized conclusion regardless of how evil his motive may be.' ") (internal citations omitted); *Shaffer v. Stewart*, 326 Pa.Super. 135, 473 A.2d 1017, 1019 (1984) (stating that " 'there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.' ") (internal citations omitted). The plaintiffs' theory is that the defendants' motivation shifted over the course of the litigation to "an improper purpose, namely to procure releases from Plaintiffs, as well as William Wallace and Great Christian (who were not parties to the Fraud Complaint [the defendants' prior suit against the plaintiffs] ) from actual claims/causes of action" resulting from the bank's previous collection efforts and litigation. (Pl.'s Opp'n Mot. Dismiss or Summ. J. at 37.) It is true the defendants sought releases, however, they also offered concessions on their side, such as releasing the judgment against Mr. Wallace and dismissing claims against Ms. Cruickshank Wallace. Thus what the plaintiffs attempt to characterize as an ulterior or unlawful purpose on the part of the defendants appears to be nothing more than an interest in settlement, in which it is standard practice to seek an agreement where both sides derive benefits as well as make concessions.

Attempting settlement falls within the scope of pursuing a lawsuit to its authorized conclusion; indeed, settlement is strongly encouraged under both Maryland and Pennsylvania law. *See Rothman v. Fillette*, 503 Pa. 259, 469 A.2d 543, 546 (1983) (stating that "[t]here is a strong judicial policy in favor of parties voluntarily settling lawsuits") (internal citations omitted); *Welsh v. Gerber Prods., Inc.*, 315 Md. 510, 555 A.2d 486, 493 (1989) (explaining that "[c]ourts look with favor upon the compromise or settlement of law suits in the interest of efficient and economic administration of justice and the lessening of friction and acrimony") (internal citations omitted). Given that all litigation among the plaintiffs, the defendants, Mr. Wallace, and Great Christian arose out of the same underlying event (the defaulted bank loan), it is not indicative of improper motivation on the part of the defendants that they sought to negotiate collectively and resolve all potential disputes surrounding the event.[24] Because the defendants thus did nothing more than pursue the lawsuit to its authorized conclusion, regardless of what their motivations may have been, the plaintiffs have failed to support a claim for abuse of process. *See One Thousand Fleet Ltd.*, 694 A.2d at 956; *Shaffer*, 473 A.2d at 1019.

*Defamation of Creditworthiness*

 The requirements for stating a claim for defamation for a non-public fig-

24. The plaintiffs cite *Weiss v. Equibank*, 313 Pa.Super. 446, 460 A.2d 271 (1983) for the proposition that bringing a complaint for the "ulterior purpose to settle other claims, even against the same defendants, is treated as Abuse of Process." (Pl.'s Opp'n Mot. Dismiss or Summ. J. at 36–37.) This case is about malicious use of process, however, which is a distinct cause of action. *See Weiss*, 460 A.2d at 275 (characterizing the complaint under consideration as being for malicious use of process).

ure are essentially the same under Pennsylvania and Maryland law. Under Pennsylvania law, the plaintiff must prove:

> (1) the defamatory character of the communication; (2) publication by the defendant; (3) its application to the plaintiff; (4) understanding by the recipient of its defamatory meaning; (5) understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm to the plaintiff; (7) abuse of a conditionally privileged occasion.

*Davis v. Res. for Human Dev.*, 770 A.2d 353, 357 (Pa.Super.2001) (internal citations omitted). Under Maryland law, the plaintiff must prove:

> (1) that the defendant made a defamatory communication—i.e., that he communicated a statement tending to expose the plaintiff to public scorn, hatred, contempt, or ridicule to a third person who reasonably recognized the statement as being defamatory; (2) that the statement was false; (3) that the defendant was at fault in communicating the statement; and (4) that the plaintiff suffered harm.

*Carter v. Aramark Sports & Entm't Servs., Inc.*, 153 Md.App. 210, 835 A.2d 262, 278 (2003) (internal citations omitted). Both jurisdictions recognize an absolute privilege for statements made in connection with judicial proceedings. *See Bochetto v. Gibson*, 580 Pa. 245, 860 A.2d 67, 71 (2004) (explaining that "a person is entitled to absolute immunity for 'communications which are issued *in the regular course of judicial proceedings* and which are *pertinent and material to the redress or relief sought*'") (internal citations omitted; italics in the original); *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 494 A.2d 200, 203 (1985) (stating that there is "an absolute privilege for defamatory statements uttered in the course of a trial or contained in pleadings, affidavits or other documents directly related to the case") (internal citations omitted).

■ The plaintiffs have not alleged that the defendants ever published the judgments they had obtained against the plaintiffs otherwise than in connection with judicial proceedings or enforcement of judgments resulting from judicial proceedings. They argue, however, that absolute judicial privilege should not attach because the defendants transferred non-final judgments from Maryland to Pennsylvania, and then when the judgments were finalized, transferred them again, resulting in multiple judgments against the plaintiffs being wrongly entered on the Chester County Court's docket. Although this understandably caused frustration and difficulty for the plaintiffs, the transfer and attempted enforcement of judgments are protected by the absolute judicial privilege, even if the defendants acted negligently or in bad faith. *See, e.g., Keys*, 494 A.2d at 204 (explaining that even when litigation stemmed from the false statement that a debt remained outstanding, "neither error contained in the statement that revived the litigation nor error on the part of the court in allowing it to be revived will defeat the privilege as to defamation when the statements and pleadings were in fact a part of a judicial process"; furthermore, "even the intentional and wrongful bringing or maintaining of litigation will not destroy the absolute privilege that attends the litigation"). The defamation claim thus will be dismissed.

### Motion for Sanctions

■ Fed.R.Civ.P. 11(b) states that one who presents a position to the court:

> is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances—(1) it is not being presented for any improper purpose,

such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law ...

If these provisions are violated, the other side may file a motion for sanctions by serving it on the alleged violator, who then has twenty-one days in which to withdraw or appropriately correct the material at issue. Fed.R.Civ.P. 11(c)(1)(A). If such measures are not taken within this "safe harbor" period, the motion may be filed with the court. *Id.* In determining whether a legal contention is unjustified, a court should employ a standard of objective reasonableness, focusing on whether "a reasonable attorney in like circumstances could [not have] believe[d] his actions to be legally justified." *In re Sargent,* 136 F.3d 349, 352 (4th Cir.1998). "[I]mposition of sanctions is discretionary with the Court, not mandatory." *Thomas v. Treasury Mgmt. Assoc.,* 158 F.R.D. 364, 369 (D.Md. 1994) (citing *Knipe v. Skinner,* 19 F.3d 72, 78 (2d Cir.1994), in explaining that the 1993 amendment to Rule 11 "makes it clear that the imposition of sanctions is discretionary with the Court, not mandatory").

The defendants' first motion for sanctions [25] is predicated on the plaintiffs' opposition to their motion for dismissal or summary judgment.[26] The plaintiffs' position with respect to each count will be considered in turn.[27] The plaintiffs attempted to voluntarily dismiss counts VI–VIII (§ 1983, § 1985, and civil conspiracy) pursuant to Fed.R.Civ.P. 41(a) during the "safe harbor" period. As discussed above, this attempt was not technically proper, however, it will be understood as a statement of the plaintiffs' lack of opposition to the defendants' request to dismiss these counts. Since this statement was made during the "safe harbor" period, no sanctions are warranted based on these three counts. *See Rector v. Approved Fed. Sav. Bank,* 265 F.3d 248, 251 (4th Cir.2001) (explaining that the purpose of the "safe harbor" period is "to provide immunity from sanctions to those litigants who self-regulate by withdrawing potentially offending filings or contentions within the

**25.** Both motions for sanctions have only been brought against Ms. Cruickshank Wallace and her attorneys because the defendants believe the trust and Holly Hall to be "essentially defunct entities under the sole control of the Wallaces." (Mot. Sanctions at 2–3.) Analysis of these motions will thus focus on the actions of Ms. Cruickshank Wallace and her counsel, but still refer to the plaintiffs collectively when necessary for accurate description.

**26.** As the plaintiffs correctly observe, a motion for sanctions under Rule 11 cannot be predicated on a complaint filed in state court that a defendant subsequently removes to federal court. *See Kirby v. Allegheny Beverage Corp.,* 811 F.2d 253, 256 (4th Cir.1987).

**27.** In addition to arguing for the lack of factual or legal justification underlying the various counts, the defendants argue that suing the law firm and Mr. Hamm in addition to the bank revealed an improper purpose. (Mot. Sanctions at 22–24.) The defendants speculate that the law firm was added for the purposes of disqualifying it from the case. (*Id.* at 23–24.) The plaintiffs have not, as of yet, moved for disqualification, and speculation that they might does not provide a proper basis for imposing sanctions. The defendants further contend that suing Mr. Hamm individually was unnecessary for the satisfaction of any judgment that might result, thus it could only be designed to harass. (*Id.:* at 23.) During the hearing on these motions, plaintiffs' counsel responded that Mr. Hamm had been included to prevent the bank from characterizing actions he took as *ultra vires* and attempting to disclaim liability for them. It is not necessary for the court to believe this was a sound tactical decision for it to be regarded as not unreasonable.

21–day period") (internal citations omitted).

■ The plaintiffs continued to press five other counts: abuse of process (counts I and II); malicious use of process (counts III and IV); and defamation of creditworthiness (count V). The abuse of process theory is debatable at best, as the plaintiffs attempted to present activities amounting to settlement negotiations as somehow improper. This theory was advanced in the alternative to the malicious use of process theory, however, for which it is not entirely unreasonable that the plaintiffs could have believed they had some basis.[28] Pennsylvania law, which the plaintiffs could reasonably have believed might have applied, makes it easier to state a claim for relief for wrongful use of civil proceedings than does the law in Maryland or in other jurisdictions still adhering to the common law cause of action. *See Rosen*, 582 A.2d at 31; *Hart v. O'Malley*, 781 A.2d 1211, 1218 (Pa.Super.2001) (defining "gross negligence" giving rise to liability under the Dragonetti Act in various ways, such as the "lack of slight diligence or care") (internal citations omitted). In the defendants' prior suit against the plaintiffs, they repeatedly sought to collect on judgments in excess of half a million dollars against Ms. Cruickshank Wallace, though she ultimately was only found liable for roughly twenty thousand dollars. The plaintiffs could have not unreasonably believed there might have been at least some factual question as to the degree of diligence or care exhibited by the defendants at all points in this process. (*See, e.g.*, Compl. at ¶¶ 54, 59, 60, 63) (alleging acts of aggression by various defendants).

■ The reasonableness of bringing the defamation of creditworthiness claim is, at best, highly doubtful. Both Maryland and Pennsylvania law provide an absolute privilege for statements made or filed in judicial proceedings, and the plaintiffs do not allege that the defendants made any statements about Ms. Cruickshank Wallace's creditworthiness outside of this context. The plaintiffs' opposition brief relies upon *Bochetto*, 860 A.2d at 73, which stands for the proposition that republication of litigation materials may fall outside the scope of the absolute privilege if not done "during the regular course of the judicial proceedings" and not "pertinent and material to those proceedings." *Id.* (internal citations omitted).[29] The defendants' alleged conduct clearly satisfies the requirements for absolute judicial privilege to attach, and the plaintiffs have failed to make any nonfrivolous argument that it should not.

There are many factors this court may consider, however, in deciding whether sanctions are warranted based on the plaintiffs' behavior. They include, but are not limited to, "whether [the improper conduct] infected the entire pleading, or only one particular count ... what effect it had on the litigation process in time or expense ... [and] the behavior of the moving party ...." *See* 5A Charles Wright & Arthur Miller, *Federal Practice and Procedure* § 1336.1 (3d ed.2004) (internal references and quotation marks omitted). As described above, the plaintiffs' opposition to the defendants' motion for dismissal or summary judgment involved some not unreasonably pursued counts, thus the unfor-

---

**28.** This court is not expressing any opinion as to the likelihood of success of a cause of action for wrongful use of civil proceedings under the Dragonetti Act.

**29.** The case which counsel mentioned during the motions hearing in support of the plain-

tiffs' position, *Green v. Mizner*, 692 A.2d 169 (Pa.Super.1997), dealt with re-publication of materials initially filed in the course of litigation outside of the context of litigation, which is only afforded a qualified privilege, *id.* at 175.

tunate addition of the unreasonable claims did not add substantially to the litigation surrounding the non-sanctionable counts that the defendants had to undertake. Furthermore, the defendants have evinced the same spirit of advancing tenuous and aggressive positions that they decry in the plaintiffs. After the case was transferred from the Eastern District of Pennsylvania to the District of Maryland, this court had to issue what was essentially a protective order providing that any local counsel obtained by the plaintiffs (without which plaintiffs' original counsel could not appear before the court) would not be subject to either of the pending Rule 11 motions. (Order, Jan. 19, 2007.)

"Motions for sanctions are to be filed sparingly." *Thomas*, 158 F.R.D. at 366. The defendants have not adhered to this principle, both in holding the threat of sanctions over potential local counsel for the plaintiffs, thereby slowing the course of litigation and requiring court intervention, as well as by filing a second motion for sanctions based on the plaintiffs' remand motion. The remand motion was premised on the position that after the claims giving rise to federal question jurisdiction had been dismissed, no independent basis for federal jurisdiction remained, thus the court should remand the case to state court. Given that there is at least some question about whether diversity jurisdiction also exists,[30] it was not unreasonable for the plaintiffs to argue that it did not, and also ask the court not to retain the state law claims. Filing a motion for sanctions based on this argument suggests a tendency on the part of the defendants to view any position taken by the plaintiffs as sanctionable. Considering all the circumstances, the court concludes

that no Rule 11 sanctions should be imposed.

A separate order follows.

### ORDER

For the reasons stated in the accompanying memorandum, it is hereby **OR-DERED** that:

1. The defendants' motion to dismiss or for summary judgment (docket entry no. 11) is **Granted;**

2. The plaintiffs' motion to remand (docket entry no. 21) is **Denied;**

3. The defendants' motions for sanctions (docket entry nos. 3 and 27) are **Denied;**

4. Judgment is **Entered** in favor of the defendants and against the plaintiffs; and

5. The Clerk shall **Close** this case.

---

**30.** The central issue regarding diversity jurisdiction is whether the amount in controversy

requirement has been satisfied.